**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GOLDEN GATE RESTAURANT
ASSOCIATION, an incorporated non-
profit trade association,
              *Plaintiff-Appellee,*

              v.

CITY AND COUNTY OF SAN
FRANCISCO,
                     *Defendant,*

              and

SAN FRANCISCO CENTRAL LABOR
COUNCIL; SERVICE EMPLOYEES
INTERNATIONAL UNION, HEALTHCARE
WORKERS-WEST; SERVICE
EMPLOYEES INTERNATIONAL UNION,
LOCAL 1021; UNITE HERE LOCAL 2,
  *Defendant-intervenors-Appellants.*

No. 07-17370

D.C. No.
CV-06-06997-JSW

13909

GOLDEN GATE RESTAURANT
ASSOCIATION, an incorporated non-
profit trade association,
                *Plaintiff-Appellee,*

                v.

CITY AND COUNTY OF SAN
FRANCISCO,
                *Defendant-Appellant,*

                and

SAN FRANCISCO CENTRAL LABOR
COUNCIL; SERVICE EMPLOYEES
INTERNATIONAL UNION, HEALTHCARE
WORKERS-WEST; SERVICE
EMPLOYEES INTERNATIONAL UNION,
LOCAL 1021; UNITE HERE LOCAL 2,
                *Defendant-intervenors.*

No. 07-17372

D.C. No.
CV-06-06997-JSW

OPINION

Appeal from the United States District Court
for the Northern District of California
Jeffrey S. White, District Judge, Presiding

Argued and Submitted
April 17, 2008—Pasadena, California

Filed September 30, 2008

Before: Alfred T. Goodwin, Stephen Reinhardt, and
William A. Fletcher, Circuit Judges.

Opinion by Judge William A. Fletcher

## COUNSEL

Stephen P. Berzon, Scott A. Kronland and Stacey M. Leyton, Altshuler Berzon, San Francisco, California, Vince Chhabria, Office of the City Attorney, San Francisco, California, for the appellants.

Curtis A. Cole and Joshua Traver, Cole Pedroza, LLP, Pasadena, California, Richard C. Rybicki, Dickenson, Peatman, & Fogarty, Napa, California, Patrick Sutton, Dickenson, Peatman & Fogarty, Santa Rosa, California, for the appellee.

*****

Leslie Robert Stellman, Hodes, Pessin & Katz, Towson, Maryland, for amicus National Federation of Independent Business Legal Foundation.

Jon W. Breyfogle, Groom Law Group, Washington, D.C., for amicus American Benefits Council.

James P. Baker, Jones Day, San Francisco, California, for amicus Employers Group.

Jeffrey A. Berman, Sidley Austin, Los Angeles, California, for amicus California Chamber of Commerce.

Thomas L. Cubbage, Covington & Burling, Washington, D.C., for amici ERISA Industry Committee and National Business Group of California.

Edward D. Sieger, US Department of Labor, Washington, D.C., for amicus Secretary of Labor.

Thomas M. Christina, Ogletree, Deakins, Nash, Smoak & Stewart, Greenville, South Carolina, for amici International Franchise Association, National Association of Manufacturers, and Society for Human Resource Management, Michael D. Peterson, Washington, D.C., for amicus HP Policy Association.

Eugene Scalia, Gibson Dunn & Crutcher, Washington D.C., for amici Retail Industry Leaders Association and Chamber of Commerce of the United States.

## OPINION

W. FLETCHER, Circuit Judge:

Plaintiff Golden Gate Restaurant Association ("the Association") challenges the employer spending requirements of the newly enacted San Francisco Health Care Security Ordinance ("the Ordinance"). The Association argues that the federal Employee Retirement Income Security Act of 1974 ("ERISA") preempts the employer spending requirements of the Ordinance either because those requirements create a "plan" within the meaning of ERISA or because they "relate to" employers' ERISA plans. On December 26, 2007, the district court granted the Association's motion for summary judgment and enjoined the implementation of the employer spending requirements. *Golden Gate Rest. Ass'n v. City & County of San Francisco*, 535 F. Supp. 2d 968, 970 (N.D. Cal. 2007). On December 27, 2007, Defendant City and County of

San Francisco ("the City") and Defendant-Intervenor labor unions requested that this court stay the judgment of the district court pending appeal. In an order filed January 9, 2008, we granted the stay. *Golden Gate Rest. Ass'n v. City & County of San Francisco* ("*Golden Gate*"), 512 F.3d 1112, 1114 (9th Cir. 2008). We now reach the merits of the appeal. We hold that ERISA does not preempt the Ordinance.

## I.    Procedural History

In July 2006, the San Francisco Board of Supervisors unanimously passed the San Francisco Health Care Security Ordinance, and the mayor signed it into law. The Ordinance is codified at Sections 14.1 to 14.8 of the City and County of San Francisco Administrative Code. The Ordinance has two primary components: the Health Access Plan ("HAP"), and the employer spending requirements. The HAP[1] is a City-administered health care program. It went into effect in the summer of 2007. In funding the HAP, the City "prioritize[s] services for low and moderate income persons." S.F. Admin. Code § 14.2(d) (2007). According to the City's web page, as of August 9, 2008, 27,395 persons had enrolled in the HAP.[2] Persons who already have health insurance or who live outside of San Francisco are not eligible for the HAP. Instead, such persons may be entitled to establish medical reimbursement accounts with the City. As we will explain in detail below, the Ordinance also requires all covered employers to make a certain level of health care expenditures on behalf of their covered employees. The Association does not challenge the HAP. It challenges only the employer spending requirements.

The Association filed a complaint against the City on November 8, 2006, asking the district court to declare that

---

[1]The HAP is now called "Healthy San Francisco."

[2]Healthy San Francisco, About Us, http://www.healthysanfrancisco.org/about_us/Stats.aspx#.

ERISA preempts the employer spending requirements, and seeking a permanent injunction against enforcement of the provisions of the Ordinance relating to those requirements. The San Francisco Central Labor Council, Service Employees International Union (SEIU) Local 1021, SEIU United Healthcare Workers-West, and UNITE-HERE! Local 2 (collectively, "Intervenors"), successfully moved to intervene as defendants.

On April 2, 2007, the City deferred implementation of the employer spending requirements until January 1, 2008. On July 13, 2007, the parties filed cross-motions for summary judgment. On December 26, 2007, the district court entered judgment for the Association, concluding that ERISA preempts the employer spending requirements. *See Golden Gate Rest. Ass'n*, 535 F. Supp. 2d at 979-80.

On December 27, 2007, the City and Intervenors asked the district court to stay its judgment pending appeal. The district court denied the motion. On January 9, 2008, this court filed a published order granting the City's motion for a stay of the district court's judgment pending resolution of the City's appeal. *Golden Gate*, 512 F.3d at 1127. Since that date, covered employers have been required to make quarterly health care expenditures.

On February 7, 2008, the Association filed an application with Justice Kennedy, as Circuit Justice for the Ninth Circuit, for an order vacating our stay of the district court's judgment. On February 21, after receiving the City's response, Justice Kennedy denied the application. The United States Secretary of Labor subsequently filed an amicus brief in this court in support of the Association.

On April 17, 2008, we heard oral argument on the merits of the City's appeal. We now reverse the judgment of the district court and remand with instructions to enter summary judgment in favor of the City and Intervenors.

## II.    Standard of Review

"We review de novo the district court's grant of summary judgment and, viewing the evidence in the light most favorable to the non-moving party, determine whether there are any genuine issues of material fact for trial." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). "ERISA preemption is a question of law, which we also review *de novo*." *Elliot v. Fortis Benefits Ins. Co.*, 337 F.3d 1138, 1141 (9th Cir. 2003).

## III.    The Ordinance

The Ordinance mandates that covered employers make "required health care expenditures to or on behalf of" certain employees each quarter. S.F. Admin. Code § 14.3(a). "Covered employers" are employers engaging in business within the City that have an average of at least twenty employees performing work for compensation during a quarter, and non-profit corporations with an average of at least fifty employees performing work for compensation during a quarter. *Id.* § 14.1(b)(3), (11), (12). "Covered employees" are individuals who (1) work in the City, (2) work at least ten hours per week, (3) have worked for the employer for at least ninety days, and (4) are not excluded from coverage by other provisions of the Ordinance. *Id.* § 14.1(b)(2).

The Ordinance sets the required health care expenditure for employers based on the Ordinance's "health care expenditure rate." *Id.* §§ 14.1(b)(8), 14.3(a). For-profit employers with between twenty and ninety-nine employees and non-profit employers with fifty or more employees must make health care expenditures at a rate of $1.17 per hour. For-profit employers with one hundred or more employees must make expenditures at a rate of $1.76 per hour. *See* City & County of San Francisco, Office of Labor Standards Enforcement, Regulations Implementing the Employer Spending Requirement of the San Francisco Health Care Security Ordinance

("ESR"), Reg. 5.2(A) (2007).[3] Under the Ordinance, "[t]he required health care expenditure for a covered employer shall be calculated by multiplying the total number of hours paid for each of its covered employees during the quarter . . . by the applicable health care expenditure rate." S.F. Admin. Code § 14.3(a).

Regulations implementing the Ordinance specify that "[a] health care expenditure is any amount paid by a covered employer to its covered employees or to a third party on behalf of its covered employees for the purpose of providing health care services for covered employees or reimbursing the cost of such services for its covered employees." ESR Reg. 4.1(A). A "covered employer has discretion as to the type of health care expenditure it chooses to make for its covered employees." ESR Reg. 4.2(A). Section 14.1(b)(7) of the Ordinance specifies that the definition of health care expenditure

includ[es], but [is] not limited to

(a) contributions by [a covered] employer on behalf of its covered employees to a health savings account as defined under section 223 of the United States Internal Revenue Code or to any other account having substantially the same purpose or effect without regard to whether such contributions qualify for a tax deduction or are excludable from employee income;

---

[3]On June 16, 2008, the City issued revised ESR regulations. Those revisions do not pertain to any of the regulations discussed in this opinion. *See* City & County of S.F. Office of Labor Standards Enforcement, Regulations Implementing the Employer Spending Requirement of the San Francisco Health Care Security Ordinance (June 16, 2008), *available at* http://www.sfgov.org/site/uploadedfiles/olse/hcso/HCSO_Final_Regulations.pdf.

(b) reimbursement by such covered employer to its covered employees for expenses incurred in the purchase of health care services;

(c) payments by a covered employer to a third party for the purpose of providing health care services for covered employees;

(d) costs incurred by a covered employer in the direct delivery of health care services to its covered employees; and

(e) payments by a covered employer to the City to be used on behalf of covered employees. The City may use these payments to:

(i) fund membership in the Health Access Program for uninsured San Francisco residents; and

(ii) establish and maintain reimbursement accounts for covered employees, whether or not those covered employees are San Francisco residents.

S.F. Admin. Code § 14.1(b)(7) (paragraphing added); *see also* ESR Reg. 4.2(A).

If an employer does not make required health care expenditures on behalf of employees in some other way, it may meet its spending requirement by making payments directly to the City under § 14.1(b)(7)(e). *See* ESR Reg. 4.2(A). We refer to this option as the City-payment option. If an employer elects the City-payment option, its covered employees who satisfy age and income requirements and are "uninsured San Francisco residents" may enroll in the HAP, and its other covered

employees will be eligible for medical reimbursement accounts with the City. Covered employees may enroll in the HAP free of charge or at reduced rates. The HAP provides enrollees with "medical services with an emphasis on wellness, preventive care and innovative service delivery." S.F. Admin. Code § 14.2(f). A primary care provider at the enrollee's "medical home" "develop[s] and direct[s] a plan of care for each [HAP] participant." *Id.* § 14.2(e). Enrollees pay income-based "participation fees" and "point-of-service fees." Regulations Implementing Health San Francisco and Medical Reimbursement Account Provisions of the San Francisco Health Care Security Ordinance, Reg. 4(a) (2007).

An employer is exempt from making payments to the City if it makes health care expenditures under § 14.1(b)(7)(a)-(d) of at least $1.17 or $1.76 per hour (depending on the nonprofit or for-profit status of the employer, and on the number of employees), and it is partially exempt to the extent that it makes lesser expenditures.

The Ordinance requires covered employers to "maintain accurate records of health care expenditures, required health care expenditures, and proof of such expenditures made each quarter each year," but it does not require them "to maintain such records in any particular form." S.F. Admin. Code § 14.3(b)(i). Employers must provide the City with "reasonable access to such records." *Id.* If an employer fails to comply with these requirements, the City will "presume[ ] that the employer did not make the required health expenditures for the quarter for which records are lacking, absent clear and convincing evidence otherwise." *Id.* § 14.3(b)(ii).

The Ordinance includes a special provision for employers with self-insured health plans. An employer providing "health coverage to some or all of its covered employees through a self-funded/self-insured plan" will "comply with the spending requirement . . . if the preceding year's average expenditure rate per employee meets or exceeds the applicable expendi-

ture rate" for the employer. ESR Reg. 6.2(B)(2). Such employers do not need to keep track of their actual expenditures for each employee.

Relevant to our analysis, there are five categories of employers under the Ordinance. First are employers that have no ERISA plans ("No Coverage Employers"). Second are employers that have ERISA plans for all employees, and that spend at least as much as the Ordinance's required health care expenditure per employee ("Full High Coverage Employers"). Third are employers that have ERISA plans for some, but not all, employees, and that spend at least as much as the Ordinance's required health care expenditure per employee for employees under the ERISA plan ("Selective High Coverage Employers"). Fourth are employers that have ERISA plans for all employees, but that spend less than the Ordinance's required health care expenditure per employee ("Full Low Coverage Employers"). Fifth are employers that have ERISA plans for some, but not all, employees, and that spend less than the Ordinance's required health care expenditure per employee for employees under the ERISA plan ("Selective Low Coverage Employers").

No Coverage Employers may choose to continue without any ERISA plans. In that event, they can make their required health care expenditures directly to the City. *See* ESR Reg. 4.2(A)(6). If these employers choose, instead, to establish an ERISA plan, the Ordinance requires only that they make the required level of health care expenditures. They can do so by paying the full amount to the plan, or by paying part to the plan and part to the City. The Ordinance does not dictate which employees must be eligible for the plan, or what benefits a plan must provide. *See* ESR Reg. 4.2(A)(1)-(5).

Full High Coverage Employers may choose to leave their ERISA plans intact and unaltered. So long as they maintain records to show that they are making the required health care expenditures, they comply with the Ordinance.

Selective High Coverage Employers may choose to leave their ERISA plans intact and unaltered. In that event, for employees not covered by their ERISA plans, they can comply with the Ordinance by making the required health care expenditures to the City. *See* ESR Reg. 6.2(C) ("An employer may . . . choose to purchase health insurance for its full-time employees, but make payment to the City to fund part-time employees' membership in the Health Access Program[.]").

Full Low Coverage Employers may choose to leave their ERISA plans intact and unaltered. In that event, they can comply with the Ordinance by making payments to the City in an amount equal to the difference between their expenditures for the ERISA plans and the required health care expenditures under the Ordinance. *See* ESR Reg. 6.2(D) ("[A]n employer who purchases a health insurance program with premiums that are less than the required expenditure . . . may choose to pay the remainder to the City to establish and maintain medical reimbursement accounts for such employees.").

Selective Low Coverage Employers may choose to leave their ERISA plans intact and unaltered. In that event, they can comply with the Ordinance for employees enrolled in their ERISA plans by paying to the City the difference between their expenditures for the plans and the required health care expenditures under the Ordinance, and for employees not enrolled in their ERISA plans by paying to the City the full amount of the required health care expenditures.

We make two observations about the Ordinance. First, the Ordinance does not require employers to establish their own ERISA plans or to make any changes to any existing ERISA plans. Employers may choose to make up the difference between their existing health care expenditures and the minimum expenditures required by the Ordinance either by altering existing ERISA plans or by establishing new ERISA plans. However, they need not do so. The City-payment option allows employers to make payments directly to the

City, if they so choose, without requiring them to establish, or to alter existing, ERISA plans. If employers choose to pay the City, the employees for whom those payments are made are entitled to receive either discounted enrollment in the HAP or medical reimbursement accounts with the City.

Second, the Ordinance is not concerned with the nature of the health care benefits an employer provides its employees. It is only concerned with the dollar amount of the payments an employer makes toward the provision of such benefits. An employer can satisfy its spending requirements by paying the City; it can satisfy those requirements by funding exclusively preventive care; it can satisfy those requirements by setting up an on-site clinic and reimbursing employees for the purchase of over-the-counter medications; or it can satisfy those requirements in some other manner, such as funding a traditional ERISA plan. The Ordinance does not look beyond the dollar amount spent, and it does not evaluate benefits derived from those dollars.

## IV.   Discussion

The Association argues that ERISA preempts the Ordinance either because it creates a "plan" within the meaning of ERISA or because it "relates to" employers' ERISA plans within the meaning of ERISA. For the reasons that follow, we disagree.

Crafted as a compromise between employers and employees, ERISA has two primary purposes. First, from the perspective of employees and other beneficiaries of ERISA plans, "ERISA was passed by Congress in 1974 to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). "In enacting ERISA, Congress' primary concern was with the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits

from accumulated funds. To that end, it established extensive reporting, disclosure, and fiduciary duty requirements to insure against the possibility that the employee's expectation of the benefit would be defeated through poor management by the plan administrator." *Id.* at 115 (citation and footnote omitted). Second, from the perspective of employers, "[t]he purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Uniformity of regulation eases the administrative burdens on employers and plan administrators, thereby reducing costs to employers.

## A.     Presumption Against Preemption

**[1]** We begin by noting that state and local laws enjoy a presumption against preemption when they "clearly operate[ ] in a field that has been traditionally occupied by the States." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (internal quotation marks omitted). This presumption informs our preemption analysis. *See Boggs v. Boggs*, 520 U.S. 833, 840 (1997) (the fact that a state law "implement[s] policies and values lying within the traditional domain of the States . . . inform[s] [a] preemption analysis"). The presumption against preemption applies in ERISA cases. "[N]othing in the language of [ERISA] or the context of its passage indicates that Congress chose to displace general health care regulation, which historically has been a matter of local concern." *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661 (1995). "[T]he Court has established a presumption that Congress did *not* intend ERISA to preempt areas of traditional state regulation that are quite remote from the areas with which ERISA is expressly concerned — reporting, disclosure, fiduciary responsibility, and the like." *Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1217 (9th Cir. 2000) (emphasis in original; internal quotation marks omitted). Further, "ERISA pre-emption must have limits when it enters areas traditionally left to state regulation — such as the state's

. . . regulation of health . . . matters." *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir. 1998).

**[2]** The field in which the Ordinance operates is the provision of health care services to persons with low or moderate incomes. State and local governments have traditionally provided health care services to such persons. *See* Paul Star, The Social Transformation of American Medicine 185 (1982) (noting that other than the four-year period from 1879 to 1883, when there was a National Board of Health, "public health remained almost entirely a state and local responsibility"); *id.* at 181-82 (describing "the role of public dispensaries in treating the sick poor"); *id.* at 169 (describing the first phase of the hospital system in the United States, spanning 1751 to 1850, in which there were charitable hospitals "and public hospitals, descended from almshouses and operated by municipalities [and] by counties"); *id.* at 171 (noting that "[p]ublic hospitals generally treated the poor [and] relied on government appropriations rather than fees"). The Ordinance uses a novel approach to the provision of health services to such persons, but operates in a field that has long been the province of state and local governments, thereby "implement[ing] policies and values lying within the traditional domain of the States." *Boggs*, 520 U.S. at 840.

## B.   Preemption Under ERISA

ERISA governs "employee benefit plans," including "employee welfare benefit plans." 29 U.S.C. § 1002(3). Section 514(a) of ERISA states that ERISA preempts "any and all State laws insofar as they . . . relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a). "A law 'relate[s] to' a covered employee benefit plan for purposes of § 514(a) if it [1] has a connection with or [2] reference to such a plan." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.* ("*Dillingham*"), 519 U.S. 316, 324

(1997) (alterations in original; some internal quotation marks omitted).

The Association and the amicus, the Secretary of Labor, make two central arguments. First, they argue that the City-payment option under the Ordinance creates an ERISA plan. This argument takes two forms. The Association argues in its brief that the Ordinance's administrative obligations on employers, in combination with a reasonable person's ability to ascertain "benefits, beneficiaries, source of financing, and procedures for receiving benefits," creates an ERISA plan. The Secretary of Labor argues as amicus that the HAP itself is an ERISA plan. If either argument is correct, the Ordinance almost certainly makes an impermissible "reference to" an ERISA plan. Second, they argue that even if the City-payment option does not establish an ERISA plan, an employer's obligation to make payments at a certain level — whether or not the payments are made to the City — "relates to" the ERISA plans of covered employers and is thus preempted. We address these arguments in turn.

1.   The City-Payment Option Does Not Create an ERISA "Plan"

If the City-payment option does not create an "employee welfare benefit plan" within the meaning of ERISA, the first argument fails. The district court concluded that employers' payments to the City do not create an ERISA plan. *See Golden Gate Rest. Ass'n*, 535 F. Supp. 2d at 976 (Ordinance does not "create[ ] a separate *de facto* ERISA plan"). For the reasons that follow, we agree with the district court and hold that the City-payment option does not create an ERISA plan, *de facto* or otherwise. We first address the Association's argument. We then address the Secretary's argument.

### a. Employers' Administrative Obligations, and the Ability to Ascertain Benefits, Beneficiaries, Financing and Procedures

[3] The first element of an employee welfare benefit plan is the existence of a "plan, fund or program." *Patelco Credit Union v. Sahni*, 262 F.3d 897, 907 (9th Cir. 2001). In the context of ERISA, the phrase "plan, fund or program" is a term of art. As relevant to this case, an ERISA "plan" is an "employee welfare benefit plan," defined as

> [a]ny plan, fund, or program which . . . is . . . established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants . . . , through the purchase of insurance or otherwise, . . . medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1); *see also* § 1002(3); *Patelco Credit Union*, 262 F.3d at 907.

[4] The Supreme Court has emphasized that ERISA is concerned with "benefit plans," rather than simply "benefits," because "[o]nly 'plans' involve administrative activity potentially subject to employer abuse." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 16 (1987). This focus on "benefit plans" is consistent with the first underlying purpose of ERISA — protecting employees against the abuse and mismanagement of funds. If an employee's expectation of a "benefit" presents "a danger of defeated expectations [that] is no different from the danger of defeated expectations of wages for services performed," then the employer's actions giving rise to that expectation do not amount to a "benefit plan" because such danger is one "Congress chose not to regulate in ERISA." *Morash*, 490 U.S. at 115.

**[5]** Two Supreme Court cases tell us that an employer's obligation to make monetary payments based on the amount of time worked by an employee, over and above ordinary wages, does not necessarily create an ERISA plan. This is so even if the payments are made by the employer directly to the employees who are the beneficiaries of the putative "plan." First, in *Fort Halifax*, a Maine statute required an employer to pay employees one week's pay for every year worked if the employees were terminated because of a plant closing. The Court held that the statute did not create a "plan" within the meaning of ERISA: "The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan*. The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation." *Id.* at 12.

Second, in *Massachusetts v. Morash*, 490 U.S. 107, 109 (1989), a Massachusetts statute required employers to pay discharged employees their "full wages, including holiday or vacation payments, on the date of discharge." The Court held that the statute was not preempted by ERISA. The Court wrote, "It is unlikely that Congress intended to subject to ERISA's reporting and disclosure requirements those vacation benefits which by their nature are payable on a regular basis from the general assets of the employer and are accumulated over time only at the election of the employee." *Id.* at 116. The Court in *Morash* emphasized the importance of the fact that the employer made the payments out of its general assets:

> An entirely different situation would be presented if a separate fund had been created by a group of employers to guarantee the payment of vacation benefits to laborers who regularly shift their jobs from one employer to another. Employees who are beneficiaries of such a trust face far different risks and have far greater need for the reporting and disclosure requirements that the federal law imposes than those

> whose vacation benefits come from the same fund
> from which they receive their paychecks.

*Id.* at 120.

[6] The employer payments at issue under the San Francisco Ordinance, which the Association contends create an ERISA plan, are not made directly to employees. Rather, they are made to the City. But even if the employers made the payments directly to the employees, *Fort Halifax* and *Morash* indicate that those payments would not be enough to create an ERISA plan. Under the Ordinance, employers make the payments on a regular periodic basis and calculate those payments based on the number of hours worked by the employee. Further, as in *Morash*, employers make the payments "on a regular basis from [their] general assets." If employers made the payments directly to the employees, there would be little to differentiate those payments from wages paid to employees. Indeed, the City allows employers to pay the City on a weekly, bi-weekly, or monthly basis, so that employers may coordinate their payments under the Ordinance with their employees' regular pay periods. *See* ESR Reg. 6.2(A)(2).

[7] The fact that an employer makes its payments to the City rather than to the employees confirms, if confirmation were needed, that the employer's administrative obligations under the City-payment option do not create an ERISA plan. Under the Ordinance, an employer has no responsibility other than to make the required payments for covered employees, and to retain records to show that it has done so. The payments are made for a specific purpose, but the employer has no responsibility for ensuring that the payments are actually used for that purpose. The Association points to the burden entailed in keeping track of which workers perform qualifying work in San Francisco, keeping track of the hours those employees work, and keeping track of the credit (if any) an employer should get for health care payments made to non-City entities. This burden is not enough, in itself, to make the

payment obligation an ERISA plan. Many federal, state and local laws, such as income tax withholding, social security, and minimum wage laws, impose similar administrative obligations on employers; yet none of these obligations constitutes an ERISA plan.

We have emphasized that an employer's administrative duties must involve the application of more than a modicum of discretion in order for those administrative duties to amount to an ERISA plan. It is within the exercise of that discretion that an employer has the opportunity to engage in the mismanagement of funds and other abuses with which Congress was concerned when it enacted ERISA. In *Bogue v. Ampex Corp.*, 976 F.2d 1319, 1323 (9th Cir. 1992), we concluded that the employer, in determining whether an employee was eligible for severance pursuant to an employment agreement, "was obligated to apply enough ongoing, particularized, administrative, discretionary analysis to make the [severance] program in this case a 'plan.' " In *Velarde v. Pace Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997), we emphasized that in order to amount to a "plan," the agreement must require the employer to apply more than "some modicum of discretion." There must be "*enough* ongoing, particularized, administrative, discretionary analysis to make the plan an ongoing administrative scheme." *Id.* (emphasis in original; citation and internal quotation marks omitted).

**[8]** An employer's administrative obligations under the City-payment option do not run the risk of mismanagement of funds or other abuse. To be sure, employers must keep track of the number of hours their employees work and whether those hours are worked in San Francisco or elsewhere. Employers must also determine whether particular employees are "supervisorial" or "managerial," and thereby not covered employees. S.F. Admin. Code § 14.1(b)(2)(d). An employer may have some incentive to minimize the number of covered employees or the number of reported hours worked in San

Francisco, but the employer has no discretion under the Ordinance to alter its books to reduce its quarterly spending obligation. Rather, the employer's administrative obligations involve mechanical record-keeping, and the employer's payments to the City "are typically fixed, due at known times, and do not depend on contingencies outside the employee's control." *Morash*, 490 U.S. at 115. Any potentially subjective judgments involved with making these calculations and maintaining these records amount to nothing more than the exercise of "a modicum of discretion."

**[9]** The Association contends that the administrative burden on the covered employers, combined with the reasonable ascertainability of benefits to employees, creates an ERISA plan. The Association contends that the employer's obligation to make payments to the City satisfies the criteria for a plan set forth in *Donovan v. Dillingham*, 688 F.2d 1367, 1370-73 (11th Cir. 1982) (en banc). Quoting *Donovan*, the Association argues, "Plan creation requires only that 'a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.' *Donovan*, 688 F.2d at 1373." We have relied on these criteria from *Donovan* in three primary circumstances in this circuit: in *Scott v. Gulf Oil Corp.*, 754 F.2d 1499 (9th Cir. 1985), in *Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374 (9th Cir. 1994), and in *Winterrowd v. American General Annuity Ins. Co.*, 321 F.3d 933 (9th Cir. 2003).

In *Scott*, we relied on the criteria set forth in *Donovan* to hold that an agreement to provide severance pay to terminated employees at a rate of two weeks' salary for each year of employment was sufficient to establish an ERISA plan. 754 F.2d at 1503-04. The outcome of *Scott* is almost certainly no longer good law in light of the Supreme Court's subsequent decisions in *Fort Halifax* and *Morash*.

In *Modzelewski*, we set forth the *Donovan* factors in determining whether an employer's promise to pay its employees

monthly installments upon retirement amounted to a de facto pension plan. 14 F.3d at 1376. We concluded that "[b]ecause ERISA's definition of a pension plan is so broad, virtually any contract that provides for some type of deferred compensation will also establish a de facto pension plan." 14 F.3d at 1377. Because ERISA's definition of "employee pension benefit plan" is distinct from its definition of "employee welfare benefit plan," *Modzelewski* is not relevant to our analysis here. *See* 29 U.S.C. § 1002(1), (2)(A); *see also Carver v. Westinghouse Hanford Co.*, 951 F.2d 1083, 1086 (9th Cir. 1991).

In *Winterrowd*, we held that an accepted offer to provide termination benefits was not sufficiently specific in describing benefits to satisfy the *Donovan* criteria, and that the offer therefore did not constitute an ERISA plan. 321 F.3d at 939. We did not hold in *Winterrowd* that an agreement satisfying the *Donovan* criteria, without more, constituted an ERISA plan. Rather, we held that an agreement not satisfying the *Donovan* criteria did not constitute an ERISA plan. In other words, satisfying the *Donovan* criteria was a necessary but not sufficient condition for the creation of an ERISA plan. *See Curtis v. Nev. Bonding Corp.*, 53 F.3d 1023, 1028 (9th Cir. 1995) (concluding that the *Donovan* criteria were not satisfied, and noting that "our court has not yet determined the minimum requirements for establishing the existence of an ERISA plan"); *see also Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1442-44 (9th Cir. 1995) (concluding that because the *Donovan* criteria were not present there was no de facto employee welfare benefit plan).

[10] The Association has not cited, and we have not discovered, any cases in which this court has applied the *Donovan* criteria to an employer's administrative obligations imposed by a state or local law. All of the cases applying the *Donovan* criteria address the question whether an informal, or de facto, ERISA plan has been established, and all involve some type of unwritten or informal promise made by an employer to its

employees. We would be very hesitant to hold that the *Donovan* criteria apply to statutory administrative burdens imposed on an employer where, as here, that employer has made no promises whatsoever to its employees, which is what the Association urges us to do. We share the view expressed by the Seventh Circuit in *Sandstrom v. Cultor Food Science, Inc.*, 214 F.3d 795 (7th Cir. 2000):

> It is not clear that the approach taken in [*Donovan*] is compatible with more recent decisions of the Supreme Court, which emphasize different considerations when asking whether an informal policy or arrangement is a "plan." Both *Morash* and *Ft. Halifax* evince reluctance to find that regular and predictable awards of severance or vacation payments establish a "plan," given the frequency with which these benefits are the subject of bilateral negotiations between employers and departing employees.

*Id.* at 797 (citations omitted).

But we need not reach the question whether *Donovan* applies, for, in any event, its criteria are not satisfied. For employers who choose to make payments to the City, their obligation ceases as soon as they make the required payments. If an employer has made such payments to the City under the Ordinance, covered employees may enroll in the HAP free of charge or at a discounted rate. But as we will explain in more detail in a moment, there is nothing in the Ordinance that guarantees that a certain level or kind of "intended benefits" will be provided by the HAP, or that a particular group of "intended . . . beneficiaries" will be included in the HAP.

#### b.    The HAP as an ERISA Plan

The Association expressly stated in its complaint that it "wholeheartedly supports the San Francisco Health Access Program and its laudable goals." It requested that the district

court "issue declaratory and injunctive relief *without* disturbing all other lawful parts of the Ordinance unrelated to" the employer spending requirement. (Emphasis in original.) The Secretary of Labor, as amicus curiae, argues that the HAP itself is an ERISA plan. If the Secretary is right, ERISA preempts not merely the employer spending requirements, but the HAP itself. We need not consider arguments raised solely by an amicus, particularly when they were not raised before the district court and when they are in tension with the strategic positions taken by the litigants. *See Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1141 n.1 (9th Cir. 1998). Further, we need not consider arguments raised for the first time on appeal. *Choe v. Torres*, 525 F.3d 733, 740 n.9 (9th Cir. 2008). We address the Secretary's argument to indicate our disagreement with it, but we do not concede the correctness of the Secretary's implicit assumption that the argument is properly before us.

[11] As described in greater detail above, the first element of an employee welfare benefit plan is the existence of a "plan, fund or program." *Patelco Credit Union*, 262 F.3d at 907. The HAP, administered by the City, is not an ERISA plan. Rather, the HAP is a government entitlement program available to low- and moderate-income residents of San Francisco, regardless of employment status.[4] It is funded primarily

---

[4]The Secretary also argues that the HAP operates as "a government-run program for private employers," and therefore it is not entitled to the exemption under 29 U.S.C. § 1003(b)(1) from ERISA regulations. The ERISA exemption to which the Secretary refers applies when a government establishes and maintains an employee welfare benefit plan for its own employees. *See id.*; *see also* 29 U.S.C. § 1002(32). As the Secretary correctly notes, a government plan of that type loses its exemption when it opens up its plan to employees of private employers. The Secretary's argument is that the City has opened its exempt plan for its own employees to private employees and has thus forfeited its exemption. The Secretary's argument is without foundation. The City does maintain an exempt employee welfare benefit plan for its own employees. The HAP, however, is not that plan. The City has never argued that the HAP is exempt from ERISA as a government-run plan for the City's own employees.

by taxpayer dollars. Employer payments under the Ordinance provide only a small portion of the HAP's funding, and, although we do not know the precise numbers, employees covered under the Ordinance comprise substantially less than half of all HAP enrollees. The fact that a minority of HAP enrollees pay a discounted enrollment fee because their employers participate in the City-payment option is not enough to make the HAP a "plan, fund or program" within the meaning of ERISA. *See Waks v. Empire Blue Cross/Blue* Shield, 263 F.3d 872, 875 (9th Cir. 2001) (concluding that a converted individual policy was not itself an ERISA plan because the policy "covered [the plaintiff] as an individual and not as an employee of . . . any . . . employer").

[12] The second element of an employee welfare benefit plan requires that the plan be "established or maintained by an employer through the purchase of insurance or otherwise." *Patelco Credit Union*, 262 F.3d at 907. An employer electing the City-payment option does not "establish[ ] or maintain[ ]" the HAP through its payments. The HAP exists, and will continue to exist, whether or not any covered employer makes a payment to the City under the Ordinance. Further, the employer has no control over whether its employees are eligible for the HAP. Under the terms of the ordinance, HAP eligibility is based on income level, age, uninsured status, and City residence, but the City is free to change the conditions of eligibility for HAP enrollment as it sees fit simply by amending the Ordinance. Finally, neither the employer nor the covered employee has any control over the kind and level of benefits provided by the HAP. The employer never negotiates or signs a contract with the City, and the employer has no control over the City's coverage decisions. When the City administers the HAP, it does not act as the employer's agent entrusted to fulfill the benefits promises the employer made to its employees. An employer can make no promises to its employees with regard to the HAP or its coverage. In short, the City, rather than the employer, establishes and maintains the HAP, and

the City is free to change the kind and level of benefits as it sees fit.

### 2.   "Relates to" Employers' ERISA Plans

The Association's and the Secretary of Labor's second argument is that, even if the City-payment option does not create an ERISA plan, the Ordinance is preempted because it "relates to" *employers'* ERISA plans. 29 U.S.C. § 1144(a).

[13] Section 514(a) of ERISA states that ERISA preempts "any and all State laws insofar as they . . . relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a). The Supreme Court has established a two-part inquiry to interpret § 514(a): "A law 'relate[s] to' a covered employee benefit plan for purposes of § 514(a) if it [1] has a connection with or [2] reference to such a plan." *Dillingham*, 519 U.S. at 324 (alterations in original) (some internal quotation marks omitted). We consider these two inquiries in turn.

### a.   "Connection with" a Plan

In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 655 (1995), the Court acknowledged the difficulty of interpreting § 514(a):

> If "relate to" were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course . . . . But that, of course, would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality.

Likewise, the Court recognized that the two-part inquiry it had adopted to interpret § 514(a) did not provide much addi-

tional guidance in cases hinging on a law's "connection with" an employee benefit plan. "For the same reasons that infinite relations cannot be the measure of pre-emption, neither can infinite connections." *Id.* at 656.

We read *Travelers* as narrowing the Court's interpretation of the scope of § 514(a). The Court reasoned it had to "go beyond the unhelpful text and the frustrating difficulty of defining [§ 514(a)'s] key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id.*; *see also Gerosa v. Savasta & Co.*, 329 F.3d 317, 327 (2d Cir. 2003) (discussing how, among the circuits, the *Travelers* decision "occasioned a significant change in preemption analysis, and required careful reconsideration of any preexisting precedent dependent on the expansive view of 'related to' that held sway before it"). In this light, we employ a "holistic analysis guided by congressional intent." *Dishman v. UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 981 n.15 (9th Cir. 2001); *see e.g.*, *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001).

As noted above, one "purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans." *Davila*, 542 U.S. at 208. The purpose of ERISA's preemption provision is to "ensure[ ] that the administrative practices of a benefit plan will be governed by only a single set of regulations." *Fort Halifax Packing Co.*, 482 U.S. at 11. In *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990), the Court explained that

> Section 514(a) was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefits law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government. Otherwise, the inefficiencies created could work to the detriment of plan beneficiaries.

**[14]** In furtherance of ERISA's goal of ensuring that "plans and plan sponsors [are] subject to a uniform body of benefits laws," the Court in *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001), struck down a Washington State law that directed a choice of beneficiary that conflicted with the choice provided in an ERISA plan. The Court held that a state or local law has an impermissible "connection with" ERISA plans where it "binds ERISA plan administrators to a particular choice of rules for determining beneficiary status[,] . . . rather than [allowing administrators to pay the benefits] to those identified in the plan documents." *Id.* at 147. Similarly, in *Shaw v. Delta Air Lines*, 463 U.S. 85, 97-100 (1983), the Court held that ERISA preempts state laws "which prohibit[ ] employers from structuring their employee benefit plans" in a particular manner or "which require[ ] employers to pay employees specific benefits."

Consistent with these later-decided cases, in *Standard Oil Co. v. Agsalud*, 633 F.2d 760, 763 (9th Cir. 1980), *aff'd mem.*, 454 U.S. 801 (1981), we struck down a Hawaii statute that "require[d] employers in that state to provide their employees with a comprehensive prepaid health care plan." As the district court noted, the statute required that plan benefits include "a combination of features," and specifically "require[d] that the plans cover diagnosis and treatment of alcohol and drug abuse." *Standard Oil Co. v. Agsalud*, 442 F. Supp. 695, 696, 704 (N.D. Cal. 1977). The statute also imposed "certain reporting requirements which differ[ed] from those of ERISA." *Id.* at 696. In affirming the district court's opinion holding the Hawaii statute preempted under ERISA, we emphasized that the statute "directly and expressly regulate[d] employers and *the type of benefits they provide* employees," and that it therefore "related to" ERISA plans under § 514(a). *Agsalud*, 633 F.2d at 766 (emphasis added). That is, the Hawaii statute was preempted because it required employers to have health plans, and it dictated the specific benefits employers were to provide through those plans. *Id.* The statute thereby impeded ERISA's goal of ensuring that "plans

and plan sponsors would be subject to a uniform body of benefits law." *Ingersoll-Rand Co.*, 498 U.S. at 142.

**[15]** The Ordinance in this case stands in stark contrast to the laws struck down in *Egelhoff*, *Shaw* and *Agsalud*. The Ordinance does not require any employer to adopt an ERISA plan or other health plan. Nor does it require any employer to provide specific benefits through an existing ERISA plan or other health plan. Any employer covered by the Ordinance may fully discharge its expenditure obligations by making the required level of employee health care expenditures, whether those expenditures are made in whole or in part to an ERISA plan, or in whole or in part to the City. The Ordinance thus preserves ERISA's "uniform regulatory regime." *See Davila*, 542 U.S. at 208. The Ordinance also has no effect on "the administrative practices of a benefit plan," *Fort Halifax Packing Co.*, 482 U.S. at 11, unless an employer voluntarily elects to change those practices.

A covered employer may choose to adopt or to change an ERISA plan in lieu of making the required health care expenditures to the City. An employer may be influenced by the Ordinance to do so because, when faced with an unavoidable obligation to make a payment at a certain level, it may prefer to make that payment to an ERISA plan. However, as *Travelers* makes clear, such influence is entirely permissible.

In *Travelers*, a New York statute required hospitals to collect surcharges from patients covered by commercial insurance companies, including those administering ERISA plans, but not from patients covered by Blue Cross/Blue Shield plans. The difference in treatment was justified on the ground that "the Blues pay the hospitals promptly and efficiently and, more importantly, provide coverage for many subscribers whom the commercial insurers would reject as unacceptable risks." *Travelers*, 514 U.S. at 658. The Court recognized that the surcharge might influence "choices made by insurance buyers, including ERISA plans." *Id.* at 659. But such an influ-

ence was not fatal to the New York statute: "An indirect economic influence . . . does not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself[.] . . . Nor does the indirect influence of the surcharges preclude uniform administrative practice[.]" *Id.* at 659-60.

In this case, the influence exerted by the Ordinance is even less direct than the influence in *Travelers*. In *Travelers*, the required surcharge on benefits provided under ERISA plans administered by commercial insurers inescapably changed the cost structure for those plans' health care benefits and thereby exerted economic pressure on the manner in which the plans would be administered. Here, by contrast, the Ordinance does not regulate benefits or charges for benefits provided by ERISA plans. Its only influence is on the employer who, because of the Ordinance, may choose to make its required health care expenditures to an ERISA plan rather than to the City.

Further, the Ordinance does not "bind[ ] ERISA plan administrators to a particular choice of rules" for determining plan eligibility or entitlement to particular benefits. *See Egelhoff*, 532 U.S. at 147. Employers may "structur[e] their employee benefit plans" in a variety of ways and need not "pay employees specific benefits." *See Shaw*, 463 U.S. at 97. The Ordinance affects employers, but it "leave[s] plan administrators right where they would be in any case." *Travelers Ins. Co.*, 514 U.S. at 662. *See also WSB Elec., Inc. v. Curry*, 88 F.3d 788, 793 (9th Cir. 1996) ("The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all."); *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 960 (3d Cir. 1994) ("Where a legal requirement may be easily satisfied through means unconnected to ERISA plans, and only relates to ERISA plans at the election of an employer, it affects employee benefit plans in too tenuous, remote, or

peripheral a manner to warrant a finding that the law 'relates to' the plan.") (some internal quotation marks omitted).

**[16]** Finally, the Ordinance does not impose on plan administrators any "administrative [or] financial burden of complying with conflicting directives" relating to benefits law. *Ingersoll-Rand Co.*, 498 U.S. at 142. The Ordinance does impose an administrative burden on covered employers, for they must keep track of their obligations to make expenditures on behalf of covered employees and must maintain records to show that they have complied with the Ordinance. But these burdens exist whether or not a covered employer has an ERISA plan. Thus, they are burdens on the employer rather than on an ERISA plan. *See WSB Elec., Inc.*, 88 F.3d at 795 (rejecting the argument that a law "is preempted because it imposes additional administrative burdens regarding benefits contributions on *the employer*," where it did "not impose any additional burden on ERISA plans or require the employer to take any action with regard to those plans") (emphasis in original).

### b.    "Reference to" a Plan

To determine whether a law has a forbidden "reference to" ERISA plans, we ask whether (1) the law "acts immediately and exclusively upon ERISA plans," or (2) "the existence of ERISA plans is essential to the law's operation." *Dillingham*, 519 U.S. at 325.

*Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825 (1988), demonstrates that the Ordinance is not preempted under the first part of the inquiry. In *Mackey*, the Court held that ERISA preempted a provision of a state garnishment statute that specifically exempted ERISA benefits from the operation of the statute, even while the statute subjected other assets to garnishment. *Id.* at 828-29. The Court noted that the provision "solely applie[d] to" ERISA plans, and "single[d] out ERISA . . . plans for different treatment

under state" law. *Id.* at 829-30. At the same time, however, the Court upheld those aspects of the state statute that did "not single out or specially mention ERISA plans of any kind," even though they would potentially subject ERISA plans to "substantial administrative burdens and costs." *Id.* at 831. In *Dillingham*, the Court characterized the preempted statute in *Mackey* as "act[ing] immediately and exclusively upon ERISA plans." *Dillingham*, 519 U.S. at 325. Here, unlike the preempted statute in *Mackey*, the Ordinance does not act on ERISA plans at all, let alone immediately and exclusively.

Two cases demonstrate that the Ordinance is not preempted under the second part of the inquiry. The first is *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990), in which the Court held that ERISA preempted a state law that "ma[de] specific reference to, and indeed [wa]s premised on, the existence of" an ERISA plan. In order for a party to bring a claim under the challenged law, "a plaintiff must plead, and the court must find, that an ERISA plan exists." *Id.* Here, by contrast, the Ordinance can have its full force and effect even if no employer in the City has an ERISA plan. Covered employers without ERISA plans can discharge their obligation under the Ordinance simply by making their required health care expenditures to the City.

The second case is *District of Columbia v. Greater Washington Board of Trade* ("*Greater Washington*"), 506 U.S. 125 (1992). A local ordinance required employers to provide workers' compensation benefits "measured by reference to 'the existing health insurance coverage' provided by the employer," and required that the coverage " 'be at the same benefit level' " as the existing coverage. *Id.* at 130. The Court held that the ordinance contained an impermissible "reference to" an ERISA plan because its requirement was measured by reference to the level of benefits provided by the employer's ERISA plan.

The district court in this case relied on the Court's opinion in *Greater Washington* in holding that the Ordinance is pre-

empted. The district court wrote, "By mandating employee health benefit structures and administration, [the Ordinance's health care expenditure] requirements interfere with preserving employer autonomy over whether and how to provide employee health coverage, and ensuring uniform national regulation of such coverage." *Golden Gate Rest. Ass'n*, 535 F. Supp. 2d at 975. Further, according to the district court, "The provisions [of the Ordinance] require private employers to meet a certain level of benefits; and those benefits are the type regularly provided by employer ERISA plans." *Id.* at 976. The district court concluded, "This Court finds that [the structure of the Ordinance] is akin to the statute the Supreme Court found preempted in *District of Columbia v. Greater Washington Board of Trade* which required the employer to provide the same amount of health care coverage for workers eligible for workers compensation." *Id.* at 978.

**[17]** There is a critical distinction between the ordinance in *Greater Washington* and the Ordinance in this case. Under the ordinance in *Greater Washington*, obligations were measured by reference to the level of *benefits* provided by the ERISA plan to the employee. Under the Ordinance in our case, by contrast, an employer's obligations to the City are measured by reference to the *payments* provided by the employer to an ERISA plan or to another entity specified in the Ordinance, including the City. The employer calculates its required payments based on the hours worked by its employees, rather than on the value or nature of the benefits available to ERISA plan participants. Thus, unlike the ordinance in *Greater Washington*, the Ordinance in this case is not determined, in the words of § 514(a), by "reference to" an ERISA plan.

The Ordinance in this case is conceptually similar to a California prevailing wage statute challenged in *WSB Electric, Inc. v. Curry*, 88 F.3d 788 (9th Cir. 1996). In that case, the California statute required an employer to pay the prevailing wage, consisting of a combination of cash and benefits. To calculate the total wage, the employer added the hourly cash

wage to its hourly contribution to the employee's benefit package. However, the statute required that a certain minimum amount be paid as a cash wage, a requirement which had the effect of putting a cap on the amount the employer could be credited for payments made to fund a benefit package. The employer was free to contribute more than the cap amount to a benefit package, but any amount above the cap was not counted toward satisfaction of the prevailing wage requirement. *Id.* at 790-91.

[18] The plaintiffs in *WSB Electric* contended that the California statute was preempted by ERISA, pointing out that some of the employers were making payments to ERISA plans, and that benefits were paid out to the employees under these plans. *Id.* at 792-93. We held, however, that the statute was not preempted. We wrote:

> At most, this scheme provides examples of the types of employer contributions to benefits that are included in the wage calculation. The scheme does not force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all. These provisions are enforced regardless of whether the individual employer provides benefits through ERISA plans, or whether the benefit contributions in a given locality are paid to ERISA plans.

*Id.* at 793-94 (citation and footnote omitted). Here, as in *WSB Electric*, employers need not have any ERISA plan at all; and if they do have such a plan, they need not make any changes to it. Where a law is fully functional even in the absence of a single ERISA plan, as it was in *WSB Electric* and as it is in this case, it does not make an impermissible reference to ERISA plans. *Cf. Travelers Ins. Co.*, 514 U.S. at 656 ("The surcharges are imposed upon patients and HMO's, regardless of whether the commercial coverage or membership, respec-

tively, is ultimately secured by an ERISA plan, private purchase, or otherwise, with the consequence that the surcharge statutes cannot be said to make 'reference to' ERISA plans in any manner.").

## C.    *Retail Industry Leaders Association v. Fielder*

Finally, the Association contends that the Ordinance is preempted under the analysis set forth in *Retail Industry Leaders Association v. Fielder*, 475 F.3d 180, 183 (4th Cir. 2007). The Association contends that we will create a circuit split if we uphold the Ordinance. We disagree. We see no inconsistency between the Fourth Circuit's holding in *Fielder* and our holding in this case.

We neither adopt nor reject the analysis of the Fourth Circuit in *Fielder*. The panel majority in that case held a Maryland law preempted over a forceful dissent. *Id.* at 201-04 (Michael, J., dissenting); *see also* Catherine L. Fisk & Michael M. Oswalt, *Preemption and Civic Democracy in the Battle over Wal-Mart*, 92 Minn. L. Rev. 1502, 1514-20 (2008). For purposes of argument, however, we assume that the panel majority in *Fielder* was correct. But even under the reasoning of the panel majority, San Francisco's Ordinance is valid.

The Maryland law at issue in *Fielder* required "employers with 10,000 or more Maryland employees to spend at least 8% of their total payrolls on employees' health insurance costs or pay the amount their spending falls short to the State of Maryland." *Fielder*, 475 F.3d at 183 (majority opinion). The Maryland law gave nothing in return — either to an employer or its employees — for the employer's payment to the State.

Wal-Mart was the only employer in Maryland affected by the law's minimum spending requirements. On the face of the law, Wal-Mart appeared to have two options. To reach the

required spending level of 8%, it could either increase contributions to its own ERISA plan, or it could pay money to the State of Maryland. But the Fourth Circuit concluded that, in practical fact, Wal-Mart had no choice. The court wrote that Wal-Mart had "noted by way of affidavit [that] it would not pay the State a sum of money that it could instead spend on its employees' healthcare." *Id.* at 193. The Fourth Circuit wrote in *Fielder*:

> This would be the decision of any reasonable employer. Healthcare benefits are a part of the total package of employee compensation an employer gives in consideration for an employee's services. An employer would gain from increasing the compensation it offers employees through improved retention and performance of present employees and the ability to attract more and better new employees. In contrast, an employer would gain nothing in consideration of paying a greater sum of money to the State. Indeed, it might suffer from lower employee morale and increased public condemnation.
>
> In effect, the only rational choice employers have under the [Maryland law] is to structure their ERISA healthcare benefit plans so as to meet the minimum spending threshold.

*Id.* The court wrote further: "[T]he amount that the [Maryland law] prescribes for payment to the State is actually a fee or a penalty that gives the employer an irresistible incentive to provide its employees with a greater level of health benefits." *Id.* at 194. Therefore, the court concluded, "the choices given in the [Maryland law] . . . are not meaningful alternatives by which an employer can increase its healthcare spending to comply with the [law] without affecting its ERISA plans." *Id.* at 196.

In stark contrast to the Maryland law in *Fielder*, the City-payment option under the San Francisco Ordinance offers employers a meaningful alternative that allows them to preserve the existing structure of their ERISA plans. If an employer elects to pay the City, that employer's employees are eligible for free or discounted enrollment in the HAP, or for medical reimbursement accounts. In contrast to the Maryland law, the San Francisco Ordinance provides tangible benefits to employees when their employers choose to pay the City rather than to establish or alter ERISA plans. In its motion for summary judgment, the Association provided no evidence to demonstrate that San Francisco employers are, in practical fact, compelled to alter or establish ERISA plans rather than to make payments to the City.[5]

[19] Because the City-payment option offers San Francisco employers a realistic alternative to creating or altering ERISA plans, the Ordinance does not "effectively mandate[ ] that employers structure their employee healthcare plans to provide a certain level of benefits." *See Fielder*, 475 F.3d at 193. In the view of the *Fielder* court, Maryland legislators intended to "force Wal-Mart to increase its spending on healthcare benefits rather than to pay monies to the State." *Id.* at 185. Unlike the Maryland law, the San Francisco Ordinance provides employers with a legitimate alternative to establishing or altering ERISA plans. *See Travelers Ins. Co.*, 514 U.S. at 664 (stating that if the New York surcharges had been "an exorbitant tax," they might leave ERISA plan purchasers "with a Hobson's choice," thereby amounting to an impermissible

---

[5]We do not rely on the following to support our decision, but we note that San Francisco has reported that as of May 1, 2008, more than seven hundred San Francisco employers have elected to comply with the Ordinance by making their health care expenditures directly to the City. Office of the Mayor, City & County of S.F., Mayor Newsom Announces Hundreds of Employers Signing Up for Healthy San Francisco Program, May 1, 2008, http://www.healthysanfrancisco.org/files/PDF/HSF_Release_5.1.2008.pdf. This document indicates that 734 employers had elected to make payments to the City on behalf of 12,900 employees. *Id.*

substantive mandate, but concluding that there was no evidence "that the surcharges are so prohibitive as to force all health insurance consumers to contract with the Blues"). We therefore conclude that the San Francisco Ordinance does not compel covered employers to establish or to alter ERISA plans. *Cf. Fielder*, 475 F.3d at 193.

## Conclusion

**[20]** There may be better ways to provide health care than to require employers in the City of San Francisco to foot the bill. But our task is a narrow one, and it is beyond our province to evaluate the wisdom of the Ordinance now before us. We are asked only to decide whether § 514(a) of ERISA preempts the employer spending requirements of the Ordinance. We hold that it does not. The spending requirements do not establish an ERISA plan; nor do they have an impermissible connection with employers' ERISA plans, or make an impermissible reference to such plans.

We therefore REVERSE the judgment of the district court and REMAND with instructions to enter summary judgment in favor of the City and Intervenors.