# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 4, 2020

Lyle W. Cayce
Clerk

No. 19-20066

In the Matter of: Westmoreland Coal Company, et al,

*Debtors*,

Michael H. Holland, *as trustee for* the United Mine Workers of America Combined Benefit Fund and United Mine Workers of America 1992 Benefit Plan; William P. Hobgood, *as trustee for* the United Mine Workers of America Combined Benefit Fund; Michael W. Buckner, *as trustee for* the United Mine Workers of America Combined Benefit Fund; Michael O. McKown, *as trustee for* the United Mine Workers of America Combined Benefit Fund and United Mine Workers of America 1992 Benefit Plan; Joseph R. Reschini, *as trustee for* the United Mine Workers of America Combined Benefit Fund and United Mine Workers of America 1992 Benefit Plan; Carlo Tarley, *as trustee for* the United Mine Workers of America 1992 Benefit Plan; Carl E. Van Horn, *as trustee for* the United Mine Workers of America Combined Benefit Fund; Gail R. Wilensky, *as trustee for* the United Mine Workers of America Combined Benefit Fund,

*Appellants*,

*versus*

Westmoreland Coal Company; Absaloka Coal, L.L.C.;
Buckingham Coal Company, L.L.C.; Dakota
Westmoreland Corporation; Daron Coal Company; et
al,

*Appellees.*

---

Appeal from the United States Bankruptcy Court
for the Southern District of Texas
USBC No. 4:18-AP-3300

---

Before Davis, Smith, and Costa, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:

This case involves the interaction of two laws that protect retirees' health care benefits. Passed in 1992, the Coal Act culminated decades of efforts to guarantee benefits for retired coal miners. It requires coal companies to pay premiums that fund retirees' benefits and limits interference with those obligations. Enacted four years earlier, section 1114 of the Bankruptcy Code followed a number of high-profile Chapter 11 cases in which debtors—among them, a coal company—unilaterally terminated their retirees' benefits. It requires a debtor to keep paying benefits unless those benefits are modified through either an agreement between the debtor and the retirees' representative or a court order. This appeal asks whether section 1114 allows for the modification of Coal Act obligations. In line with every other court that has answered the question, we conclude that it does.

I.

A.

The history of the Coal Act is detailed elsewhere, so we review it only briefly. *See generally E. Enterprises v. Apfel*, 524 U.S. 498, 504–15 (1998); *In re Walter Energy, Inc.*, 911 F.3d 1121, 1126–32 (11th Cir. 2018).

No. 19-20066

Before the Coal Act, a series of National Bituminous Coal Wage Agreements between the United Mine Workers of America (UMWA) and coal companies had resulted in two multiemployer trusts that provided health care benefits to retired miners: the 1950 Benefit Plan and the 1974 Benefit Plan and Trust. These trusts guaranteed lifetime benefits, but they quickly encountered financial difficulties due to rising health care costs, increases in the number of covered beneficiaries, and decline in the coal industry. In response, the union and coal companies agreed in 1978 to move away from multiemployer plans. Each coal company became responsible for financing its own individual employer plan (IEP). But the 1950 and 1974 Plans remained in effect for limited purposes. The 1950 Plan covered retirees who were already enrolled, and the 1974 Plan covered "orphaned" retirees whose employers had gone out of business. Despite these reforms, the Plans' financial woes continued to deepen as some coal companies refused to sign on to the wage agreements and others exited the industry.

To remedy the Plans' financial troubles, Congress enacted the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act). Pub. L. No. 102-486, 106 Stat. 2776. The Act requires coal companies that had entered into any National Bituminous Coal Wage Agreements from 1978 on—the statute calls such companies "signatory operator[s]"—to provide retirees' health care benefits through IEPs.[1]  26 U.S.C. § 9711(a). That obligation continues as long as the company or a "related person" remains in business. *Id.*; *see also id.* § 9701(c)(2) (defining "related persons"). The Act also created two new multiemployer plans. The Combined Fund merged the 1950 and 1974 Plans. *Id.* § 9702(a)(2). The 1992 Benefit Plan covers retirees who could have received benefits under the 1950 or 1974 Plans but had not retired when the

---

[1] The Coal Act does not cover coal miners who retired after September 30, 1994. 26 U.S.C. §§ 9711(b)(1), 9712(b)(2).

Coal Act was passed as well as orphaned retirees who are entitled to IEP coverage but are not yet receiving those benefits. *Id.* § 9712(b)(2). Each plan's funding consists primarily of "premiums" levied on signatory operators[2] and money from the federal government. *Id.* §§ 9704(a), 9705(b)(1); 9712(a)(3), (d)(1). A signatory operator's premium obligations extend to "related person[s]" such that, when it "sells substantially all of its assets, the purchaser inherits the obligation to pay" the premiums. *Walter Energy*, 911 F.3d at 1131–32; *see also* 26 U.S.C. §§ 9706(a), 9712(d)(4).

Also included in the Coal Act are several provisions that protect its benefit scheme. Two are relevant to this case. One annuls "any transaction" with "a principal purpose" of "evad[ing] or avoid[ing] liability" under the Act. *Id.* § 9722. The other is specific to the Combined Fund and states that "[a]ll liability for contributions to" that fund "shall be determined exclusively under" the Act. *Id.* § 9708. Even though the Coal Act contains these and other safeguards, it does not expressly address the fate of an operator's premium obligations when the operator enters bankruptcy.

The Bankruptcy Code does address a debtor's health care obligations to its retirees. Four years before Congress passed the Coal Act, it added section 1114 to the Code. It responded to a series of Chapter 11 debtors—most famously, the coal company LTV—that unilaterally terminated their retirees' health care benefits. 7 Collier on Bankruptcy ¶ 1114.01[2], at 1114-10 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. 2019). Section 1114 requires a debtor to continue paying promised "retiree benefits" unless the debtor and the retirees' representative agree to modify those benefits or a bankruptcy court orders modification. 11 U.S.C.

---

[2] A signatory operator's premiums are calculated based on the retirees "assigned" to it under each plan. 26 U.S.C. §§ 9704(b), 9706(a)(1)–(2), 9712(d)(1)(A). Only signatories to the 1988 agreement must pay premiums to the 1992 Plan. *Id.* § 9712(d)(6).

§ 1114(e)(1). A debtor can move for court-ordered modification if it first proposes modifications to the retirees' representative and negotiates in good faith, only to have the representative refuse the proposal "without good cause." *Id.* § 1114(f), (g)(1)–(2). In that case, the court "shall" order modification if it "is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities." *Id.* § 1114(g)(3).

## B.

In October 2018, Westmoreland Coal Company and its affiliates[3] filed Chapter 11 petitions. As part of its reorganization, Westmoreland negotiated an agreement with creditors to sell the bulk of its assets through an auction. Every bidder conditioned its purchase of Westmoreland's assets on the termination of successor liability for Westmoreland's Coal Act obligations.

Consequently, Westmoreland proposed modifying those obligations under section 1114. The Trustees of the Combined Plan and the 1992 Plan responded by filing a complaint for a declaratory judgment that Coal Act obligations are not "retiree benefits" and thus cannot be modified under section 1114. Westmoreland moved for a Rule 12(c) judgment on the pleadings.

Before the bankruptcy court ruled, the Eleventh Circuit decided the same issue. *See In re Walter Energy, Inc.*, 911 F.3d 1121 (11th Cir. 2018). *Walter Energy*—in which the Trustees were a party—determined that Coal Act obligations were "retiree benefits" subject to modification under section

---

[3] Unless differentiation between the Appellees is necessary, this opinion refers to them collectively as "Westmoreland" for simplicity.

1114. *Id.* at 1126.[4]  Two days later, the bankruptcy court issued an opinion arriving at the same conclusion.  It then certified its judgment for direct appeal to our court.  *See* 28 U.S.C. § 158(d)(2)(A)(i), (iii).[5]

## II.

"When directly reviewing an order from a bankruptcy court, findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo.*"  *In re OCA, Inc.*, 552 F.3d 413, 419 (5th Cir. 2008).  This appeal involves the latter.  But Westmoreland says we should engage in no review at all because the Trustees lost on these same issues in the Eleventh Circuit.  It contends *Walter Energy* precludes relitigating the issues in the different bankruptcy in this circuit.

Issue preclusion, or collateral estoppel, prevents the same party from relitigating an issue when "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; and (3) the previous determination was necessary to the decision."  *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290

---

[4] The Eleventh Circuit affirmed a district court and a bankruptcy court. *See United Mine Workers of Am. 1974 Pension Plan & Tr. v. Walter Energy, Inc.*, 579 B.R. 603 (N.D. Ala. 2016); *In re Walter Energy, Inc.*, 542 B.R. 859 (Bankr. N.D. Ala. 2015).  When this opinion mentions "*Walter Energy*" without citation, it refers to the Eleventh Circuit's decision.

[5] Meanwhile, the bankruptcy court appointed a committee as the retirees' authorized representative for benefit modification negotiations.  Westmoreland and the committee eventually reached a settlement.  They agreed that Westmoreland will help transition retirees enrolled in its IEP to the 1992 Plan (in part by extending IEP coverage until retirees are covered by the 1992 Plan) and that its Coal Act premium obligations will end once it sells its assets.  Westmoreland told the court that terminating successor liability for its Coal Act obligations was necessary to sell its assets, keep its mines running, and save thousands of its miners' jobs.  The bankruptcy court conditionally approved the settlement pending appeal to our court.  It found that the settlement was "better for the Coal Act retirees, the Coal Act Funds, and all of [Westmoreland's] constituencies, than the alternative."  Although the settlement meant the court did not need to make section 1114(g)(3) findings, it did so as an alternative ground for approving the termination of Coal Act obligations.

(5th Cir.2005) (en banc).[6]  This suit checks all three boxes: *Walter Energy* rejected the same outcome-determinative claim the Trustees press again here.

But something seems amiss.  If one circuit's resolution of a legal issue is binding when the losing litigant has a case in another circuit, how would circuit splits develop with repeat litigants (like the Trustees here or, perhaps most often, the federal government)?  Sure enough, there is an exception to nonmutual issue preclusion for pure issues of law.  Preclusion does not apply if "[t]he issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based."  Restatement (Second) of Judgments § 29(7) (1982).  Two situations in which issue preclusion is usually inappropriate are when the issue was previously decided by a coordinate court of appeals or when the issue is of public importance but the highest court that can resolve it has not done so.  *Id.* cmt. i.  Applying preclusion in those circumstances would inhibit a court from "perform[ing] its function of developing the law."  *Id.*; *see also* 18 Charles Alan Wright et al., Federal Practice and Procedure § 4425, at 697–701 (3d ed. 2016) (summarizing the considerations underpinning "[t]he rule that issue preclusion does not attach to abstract rulings of law," *id.* at 697).

The Trustees' suit falls within this exception.  It presents only questions of law.  So preclusion is inappropriate both because the other court that decided them was a fellow intermediate federal court and because they

---

[6] A fourth factor—whether any special circumstances would make preclusion unfair—applies only to offensive issue preclusion. *Bradberry v. Jefferson Cty.*, 732 F.3d 540, 548 (5th Cir. 2013).  It does not apply here because Westmoreland has invoked preclusion as a defense.

are important ones the Supreme Court has not decided. Issue preclusion thus does not bar the Trustees' suit. *See Pharm. Care Mgmt. Ass'n v. District of Columbia*, 522 F.3d 443, 446–47 (D.C. Cir. 2008) (declining to apply issue preclusion to legal question under ERISA addressed in First Circuit case); *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007) (declining to apply issue preclusion to Foreign Sovereign Immunities Act issue decided in Fifth Circuit case).

We nevertheless consider the Eleventh Circuit's recent decision as persuasive authority. That is no small thing. Our usual reluctance to create circuit splits is even more pronounced in bankruptcy cases where the need for uniformity is a constitutional command. *In re Ultra Petroleum Corp.*, 943 F.3d 758, 763–64 (5th Cir. 2019) (citing *In re Marciano*, 708 F.3d 1123, 1135 (9th Cir. 2013) (Ikuta, J., dissenting) (quoting U.S. CONST. art. I, § 8, cl. 4)).

## III.

There is a threshold question before we get to the heart of the matter: Does the Anti-Injunction Act bar a section 1114 modification of Coal Act premiums? The Anti-Injunction Act (AIA) prohibits "suit[s] for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a). It "protects the Government's ability to collect a consistent stream of revenue" and requires taxes to be challenged "only after they are paid." *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 543 (2012). When the AIA applies, it divests courts of subject-matter jurisdiction. *Hotze v. Burwell*, 784 F.3d 984, 996 (5th Cir. 2015). The Trustees' argue that Coal Act obligations are taxes, so there is no jurisdiction in a section 1114 proceeding to modify them.

No. 19-20066

## A.

The parties disagree about what the relevant "suit" is for purposes of the AIA. Westmoreland contends that its Chapter 11 bankruptcy case is not an adversarial "suit" subject to the AIA but is instead a petition to a bankruptcy court for relief. But adversary proceedings like the one the Trustees initiated "are separate lawsuits within the context of a particular bankruptcy case." 10 Collier, *supra*, ¶ 7001.01, at 7001-3; *see also In re TWL Corp.*, 712 F.3d 886, 892 (5th Cir. 2013). Consequently, the AIA can still apply to them. *See Laughlin v. I.R.S.*, 912 F.2d 197, 199–200 (8th Cir. 1990); *In re Am. Bicycle Ass'n*, 895 F.2d 1277, 1279–80 (9th Cir. 1990); *Matter of LaSalle Rolling Mills, Inc.*, 832 F.2d 390, 392–94 (7th Cir. 1987).

Even though we look at this adversary proceeding rather than the bankruptcy as a whole, Westmoreland still says the AIA does not apply. That is because it is a suit brought by the Trustees to compel the collection of taxes—if that is what Coal Act premiums are—as opposed to a suit to "restrain" collection. Indeed, this declaratory judgment action is in a posture different from that of other cases that addressed the AIA in proceedings where debtors actually moved to modify their obligations. *Walter Energy*, 911 F.3d at 1133–34; *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996). For that reason, the Trustees agree that the AIA does not bar *this* proceeding; they are the ones who filed it after all. But, the Trustees explain, this suit asks us to declare what the law is for the impending section 1114 proceeding. That is typically the point of a declaratory judgment—to decide the issues in another suit that is on the horizon. *See* 10B Wright et al., *supra*, § 2751 ("[The declaratory judgment] gives a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy and in cases in which a party who could sue for coercive relief has not yet done so."). Because we end up holding that the

No. 19-20066

AIA is not a bar, we will assume the declaratory judgment posture allows us to decide if the AIA would forbid the section 1114 proceeding that everyone agreed was going to happen (and now has).[7]

B.

1.

The key question is whether a Coal Act premium is a "tax" under the AIA. *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, helps with the answer. It held that because the AIA is a "creature[] of Congress's own creation," something is a tax under the AIA only when Congress intended it to be. *Id.* at 544. In other words, the statutory bar on suits to stop the collection of taxes applies only to exactions Congress considered to be taxes. And "the best evidence of Congress's intent is the statutory text." *Id.* It is particularly significant when Congress describes some exactions in a statutory scheme as "taxes" but not others. *Id.*; *see also Hotze*, 784 F.3d at 997. This approach stands in contrast to the framework for evaluating whether an exaction is a tax in the *constitutional* sense, in which case the label Congress uses is of minimal importance. *See NFIB*, 567 U.S. at 544, 564–66. So the AIA applies to something that is not really a tax when it nonetheless has that label, *see id.* at 544 (citing *Bailey v. George*, 259 U.S. 16 (1922)), and does not apply to something that is a tax but doesn't have that

---

[7] The text of the AIA differs from that of the Declaratory Judgment Act, which does not allow courts to issue declaratory judgments "with respect to Federal taxes" (subject to several exceptions). 28 U.S.C. § 2201(a). Although the Trustees request a declaratory judgment, neither party asserts that the Declaratory Judgment Act would bar a suit that the AIA does not. We thus assume without deciding that the two statutes are coterminous and limit our discussion to the AIA. *See, e.g.*, *Cohen v. United States*, 650 F.3d 717, 727–31 (D.C. Cir. 2011) (en banc); *Leckie Smokeless*, 99 F.3d at 583–84.

label, *see id*. at 544–46. With the AIA, form—specifically, the label Congress uses—does matter over substance.

The Coal Act's labels indicate that Congress did not intend premiums to be taxes for AIA purposes. Most obviously, Congress called the annual exactions on signatory operators "premiums," not taxes. *E.g.*, 26 U.S.C. § 9704(a) (Combined Fund); *id*. § 9712(d)(1)(A) (1992 Plan). And its use of the word "tax" elsewhere in the Coal Act—especially its express treatment of penalties for failing to pay Combined Act premiums as a tax—shows that this word choice was intentional. *See id*. § 9707(f) (providing that the penalty for failing to pay Combined Fund premiums "shall be treated in the same manner as [a] tax"); *see also id*. § 9702(a)(4) (granting Combined Fund tax-exempt status); *id*. § 9705(a)(4)–(5) (describing tax treatment of money transferred from the 1950 and 1974 Plans to the Combined Fund). In addition, although the Coal Act's provisions are in the Internal Revenue Code, they are under the subtitle "Coal Industry Health Benefits" while other subtitles expressly describe their contents as taxes. *Compare* 26 U.S.C. Subtitle J ("Coal Industry Health Benefits"), *with, e.g. id*. Subtitle A ("Income Taxes"). *See also I.N.S. v. Nat'l Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

The Trustees raise several counterarguments. First, they assert that premiums are the "same thing" as taxes because the government assesses them for a public purpose. But that functional analysis misses the point of *NFIB*: because the AIA is a statutory creature, how Congress *labels* the exaction is key. *See* 567 U.S. at 544 (rejecting the argument that "even though Congress did not label the shared responsibility payment a tax, we should treat it as such under the Anti-Injunction Act because it functions like a tax").

No. 19-20066

Second, the Trustees point to several cases holding that Coal Act premiums are taxes. But only one addressed the application of the AIA.[8] *See Leckie Smokeless*, 99 F.3d at 583. And all the cases predated *NFIB* and relied on a functional approach that put little, if any, weight on congressional labels. *See, e.g.*, *In re Chateaugay Corp.*, 53 F.3d 478, 498 (2d Cir. 1995) (looking at whether an exaction is "[a]n involuntary pecuniary burden, *regardless of name*" (emphasis added)).

The Trustees' final argument holds more water. They point to 26 U.S.C. § 9707, which imposes a penalty for failing to pay Combined Fund (but not 1992 Plan) premiums and states that the penalty "shall be treated in the same manner as the tax imposed by section 4980B." *Id.* § 9707(a), (f). This time the label makes the penalty a tax under the AIA. *See NFIB*, 567 U.S. at 544 ("Congress can . . . describe something as a penalty but direct that it nonetheless be treated as a tax for purposes of the Anti-Injunction Act.").

That potentially means the AIA forbids not only suits involving the penalty for failing to pay Combined Fund premiums, but also suits involving the Combined Fund premiums themselves. At least two circuits have held that the AIA prohibits challenges to nontax obligations if those obligations are enforced by a tax because relief from the nontax obligation would "necessarily 'restrain' the assessment and collection of the tax." *See Fla. Bankers Ass'n v. U.S. Dep't of the Treasury*, 799 F.3d 1065, 1072 (D.C. Cir. 2015) (Kavanaugh, J.); *accord CIC Servs., LLC v. IRS*, 925 F.3d 247, 257 (6th

---

[8] Three of the others considered whether Coal Act premiums were a "tax" entitled to administrative-expense priority under the Bankruptcy Code. *See In re Sunnyside Coal Co.*, 146 F.3d 1273, 1276–78 (10th Cir. 1998); *Adventure Res. Inc. v. Holland*, 137 F.3d 786, 793–95 (4th Cir. 1998); *In re Chateaugay Corp.*, 53 F.3d 478, 498 (2d Cir. 1995). Another evaluated a takings claim. *See Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 675 (3d Cir. 1999).

Cir. 2019).  The Eleventh Circuit applied this principle to Combined Fund premiums, explaining that even a suit to modify only the premiums would "mak[e] it impossible for the Combined Fund to assess or collect a tax—that is, the penalty imposed by the Coal Act for a company's failure to pay its premiums."  *Walter Energy*, 911 F.3d at 1141.

Like the Eleventh Circuit, we will assume that, because the section 9707 penalty should be treated like a tax, Combined Fund premiums are effectively taxes under the AIA too.  We thus consider whether an exception to the AIA permits litigation to modify Combined Fund premiums.

2.

The AIA applies "only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf."  *South Carolina v. Regan*, 465 U.S. 367, 381 (1984).  In a typical tax case, that other avenue is a postpayment refund suit.  *NFIB*, 567 U.S. at 543.  The exception, then, is that when no alternative avenue for federal court jurisdiction exists, the AIA will not bar a suit to restrain tax collection.  *Regan*, 465 U.S. at 381 (concluding that the AIA did not block South Carolina's suit challenging a federal tax on state bonds on Tenth Amendment grounds because there was no other way to bring that claim).  The same idea underlies courts' reluctance to read a statute as precluding all judicial review as opposed to merely channeling litigation into a specific forum.  *See generally Elgin v. Dep't of Treasury*, 567 U.S. 1, 9–10 (2012).

Two courts have held that bankruptcy court motions to modify Coal Act obligations fit within the *Regan* exception.  *See Walter Energy*, 911 F.3d at 1141–42 (addressing section 1114 proceeding like this one); *Leckie Smokeless*, 99 F.3d at 584–85 (addressing section 363(f) request to sell assets "free and clear" of Coal Act obligations).  As the Eleventh Circuit explained, a debtor cannot modify its retiree benefits except through section 1114, which applies

No. 19-20066

only to Chapter 11 proceedings in bankruptcy court. *Walter Energy*, 911 F.3d at 1141–42 (citing 11 U.S.C. § 103(g)). That means a debtor cannot bring a postassessment refund suit to modify its Coal Act obligations because the district court entertaining that suit would lack the power to grant relief under section 1114. *Id.*

The Trustees do not point to an alternative avenue that Westmoreland could pursue. Instead, they argue that the *Regan* exception is "very narrow" and "almost unique." *E.g.*, *RYO Mach., LLC v. U.S. Dep't of Treasury*, 696 F.3d 467, 472 (6th Cir. 2012). In particular, they contend that *Regan* applies only to suits challenging the *validity* of a tax.[9] Several cases in the Trustees' briefs describe *Regan*'s holding in those terms, but they are distinguishable.[10]

The bigger point is that other courts—including ours, though we have not discussed *Regan* at length—view the exception more broadly. *See Interfirst Bank Dallas, N.A. v. United States*, 769 F.2d 299, 307 n.13 (5th Cir. 1985) ("In *Regan*, the Supreme Court held that the [AIA] was not intended

---

[9] The Trustees also point out that some courts have noted that *Regan* involved the Supreme Court's original jurisdiction. *See RYO Mach.*, 696 F.3d at 472; *LaSalle Rolling Mills*, 832 F.2d at 393. Though other courts have considered that posture relevant, the *Regan* Court expressly declined to reach South Carolina's argument that applying the AIA would have unconstitutionally restricted its original jurisdiction. 465 U.S. at 373 n.9.

[10] Three cases barred attempts by Chapter 11 debtors to enjoin the IRS from collecting undisputedly lawful taxes merely to facilitate reorganization. *See LaSalle Rolling Mills*, 832 F.2d at 391–93; *see also Laughlin*, 912 F.2d at 199; *In re Am. Bicycle Ass'n*, 895 F.2d at 1280–81. A fourth case found the AIA prohibited a nonprofit watchdog from enjoining an IRS audit to determine its tax liability. *See Judicial Watch, Inc. v. Rossotti*, 317 F.3d 401, 408 (4th Cir. 2003). In three of these cases, the court observed that alternative remedies were available. *See Judicial Watch*, 317 F.3d at 408; *LaSalle Rolling Mills*, 832 F.2d at 393; *Am. Bicycle Ass'n*, 895 F.2d at 1281 n.4. None of them addressed a situation where the AIA would have blocked the operation of an independent statute that entitles a party to seek relief from a certain category of tax liability, as is the case here.

to bar an action where Congress has not provided an adequate, alternative remedy." (citation omitted)); *see also, e.g.*, *Walter Energy*, 911 F.3d at 1138; *SEC v. Credit Bancorp., Ltd.*, 297 F.3d 127, 139 (2d Cir. 2002). That view is consistent with the language the Supreme Court used in *Regan*, which does not limit the exception to validity challenges. *See* 465 U.S. at 378 ("In sum, the [AIA's] purpose and the circumstances of its enactment indicate that Congress did not intend the [AIA] to apply to actions brought by aggrieved parties for whom it has not provided an alternative remedy."); *id.* at 381 ("[T]he [AIA] was intended to apply only when Congress has provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf.").

We therefore side with the other two courts of appeals to decide the issue and hold that, because bankruptcy court is the only place a debtor can use section 1114 to modify its Coal Act obligations, the AIA does not bar adversary proceedings seeking to do so.

IV.

We finally reach the merits and examine whether Coal Act obligations are "retiree benefits" subject to modification under section 1114. We note at the outset that all courts to consider the question have held that Coal Act obligations are subject to modification. *See Walter Energy*, 911 F.3d at 1142–51; *In re Alpha Nat. Res., Inc.*, 552 B.R. 314, 326–28 (Bankr. E.D. Va. 2016); *In re Horizon Nat. Res. Co.*, 316 B.R. 268, 274–79 (Bankr. E.D. Ky. 2004).

We first analyze section 1114's text to see if the law covers Coal Act obligations. Because we conclude that it does, we then address the interaction of section 1114 with the Coal Act.

A.

Section 1114 defines "retiree benefits" as:

[P]ayments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death under any plan, fund, or program (through the purchase of insurance or otherwise) maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C. § 1114(a). The parties' textual disputes center on whether Coal Act obligations are "under any plan, fund, or program . . . maintained . . . in whole or in part" by Westmoreland "prior to filing" bankruptcy.

1.

The first question is whether Westmoreland's payment of premiums "maintained" the Coal Act plans (at least in part). The statute does not define "maintain," so we look to the word's ordinary meaning. *United States v. Lauderdale Cty.,* 914 F.3d 960, 964 (5th Cir. 2019). Dictionaries indicate that providing financial support fits within the plain meaning of "maintain." *Maintain*, Black's Law Dictionary (6th ed. 1990) (including "bear the expense of" and "furnish means for subsistence or existence of"); Webster's Third New International Dictionary 1362 (1993) ("to provide for : bear the expense of"); 9 Oxford English Dictionary 224 (2d ed. 1989) ("to bear the expense of, afford"). A homeowner who pays HOA fees thus helps maintain the homeowner's association.

The Trustees counter that "an employer does not 'maintain' a plan simply by cutting checks; a plan is 'maintained' by the persons who operate and administer it day-in and day-out." For support, they cite cases interpreting "employee welfare benefit plan" under ERISA, which they

believe should be read consistent with "retiree benefits" in section 1114 because they share similar language.[11]

The Trustees' argument faces several roadblocks. First, they cite no cases saying that "employee welfare benefit plan" and "retiree benefits" should be read the same (the Latin phrase is *in pari materia*). Although some courts have looked to the former to interpret the latter, they do so to inform the phrase "any plan, fund, or program," not "maintained or established." *See* 7 COLLIER, *supra*, ¶ 1114.02[2][b], at 1114-12 (citing cases). And although the Bankruptcy Code does define some terms by cross-referencing other federal statutes,[12] section 1114 does not refer to ERISA. *See United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 219–20 (1996).

Second, the two provisions come from statutory schemes with different purposes. Indeed, they are different enough that the Supreme Court has warned against courts' using ERISA to "fill in blanks in a

---

[11] Below is the definition of "employee welfare benefit plan" under 29 U.S.C. § 1002(1). Language similar to section 1114's definition of "retiree benefits" is in italics.

> *[A]ny plan, fund, or program* which was heretofore or is hereafter *established or maintained* by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained *for the purpose of providing* for its participants or their beneficiaries, *through the purchase of insurance or otherwise*, (A) *medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death* or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

[12] *See, e.g.*, 11 U.S.C. § 101(41)(C)(ii) (defining "eligible deferred compensation plan" with reference to the Internal Revenue Code); *id.* § 761(5) (defining "commodity option" with reference to the Commodity Exchange Act).

Bankruptcy Code provision." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 661 (2006). Even the courts that have looked to ERISA for guidance in interpreting "retiree benefits" have acknowledged doing so "with due regard . . . for the different purposes that animate ERISA and the Bankruptcy Code." *E.g.*, *In re Avaya Inc.*, 573 B.R. 93, 102 (Bankr. S.D.N.Y. 2017). Those different purposes prevent us from reading the statutes in tandem. *See Latimer v. Sears Roebuck & Co.*, 285 F.2d 152, 157 (5th Cir. 1960) ("[A] statute is not in pari materia if its scope and aim are distinct . . . ." (citation omitted)).

Third, though the cases the Trustees cite suggest that "maintaining" an ERISA plan may require something more than financial support, none definitively says that. Three of them grappled with the preliminary question of whether a "plan" exists. *See Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 6, 12, (1987); *Cantrell v. Briggs & Veselka Co.*, 728 F.3d 444, 451 (5th Cir. 2013); *Golden Gate Rest. Ass'n v. City & Cty. of S.F.*, 546 F.3d 639, 648–52 (9th Cir. 2008).[13] Two others held that a plan was not an employee welfare benefit plan because it was not established or maintained by an employer or employee organization. *See MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 185–86 (5th Cir. 1992); *Taggart Corp. v. Life & Health Benefits Admin., Inc.*, 617 F.2d 1208, 1210 (5th Cir. 1980). Another two concerned whether a plan satisfied an exemption from ERISA's coverage. *See Medina v. Catholic Health Initiatives*, 877 F.3d 1213, 1219 (10th Cir. 2017) (church

---

[13] *Golden Gate* did state that employers forced to pay into a city-run health care plan did not "establish[] or maintain[]" it for purposes of ERISA. 546 F.3d at 653 (alterations in original). The panel reasoned that (1) the plan existed regardless of whether an employer made payments to the city; (2) employers had no control over conditions of eligibility; and (3) employers had no control over the benefits provided. *Id.* at 653–54. Nevertheless, this reasoning was dicta because the court was responding to the argument of an amicus "to indicate [the court's] disagreement" without "conced[ing] . . . that the argument [was] properly before [it]." *Id.* at 653.

plan)[14]; *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 448–49 (5th Cir. 1995) (governmental plan).[15]

Finally, the language of section 1114 differs in at least one key respect from the language in ERISA's definition of "employee welfare benefit plan": whereas section 1114 qualifies "maintained" with the phrase "in whole or in part," ERISA's definition contains no similar qualification. What is required to maintain something in part of course may differ from what is required to maintain something in whole. Even if merely "cutting checks" does not maintain a plan *in whole*, providing financial support does so *in part*.[16]

In sum, the ordinary meaning of "maintain" includes providing financial support. The Trustees have not convincingly demonstrated that ERISA cases suggesting otherwise should govern section 1114. Coal Act obligors thus "maintain" the Combined Fund and the 1992 Plan, in part, by funding them.

---

[14] *Medina* did interpret the word "maintain" under 29 U.S.C. § 1002(33)(C)(i) (which defines church plans) to mean "cares for the plan for purposes of operational productivity." 877 F.3d at 1226. But it "t[ook] no position . . . on what 'maintain' might mean in other provisions of ERISA, where context may present a different answer." *Id.* n.4.

[15] *Hightower* turned on whether a county government or a private foundation "maintained" a plan. 65 F.3d at 449. Without defining "maintain," the panel concluded that the foundation's "assumption" of responsibility for the plan under a lease agreement meant the foundation "maintained" it. *Id.* The panel did not decide if something less, such as providing mere financial support for a plan, could constitute "maintaining" it.

[16] The Trustees argue that the phrase "in whole or in part" does not diminish what it means to "maintain[]" a plan. Instead, they assert, it is included to encompass both debtors who maintain their own plans and debtors who jointly maintain a multiemployer plan. Their reading is possible, but it is not the most natural one. Indeed, ERISA's definition of "employee welfare benefit plan" also covers multiemployer plans despite omitting the phrase "in whole or in part." It refers to plans "established or maintained by an employer," 29 U.S.C. § 1002(1), and then defines the word "employer" to "include[] a group or association of employers," *id.* § 1002(5).

No. 19-20066

2.

The Trustees argue that, even if Westmoreland "maintained" the funds by paying premiums, its other Coal Act obligations do not constitute "retiree benefits" subject to modification. In particular, they assert that posting security for the 1992 Plan did not maintain the plans "prior to filing a petition" under Chapter 11.[17]

Under the Coal Act, a 1988 last signatory operator[18] must provide security "in an amount equal to a portion of the projected future cost" of providing healthcare benefits to its retirees under the 1992 Plan. 26 U.S.C. § 9712(d)(1)(B). That security can take the form of a bond, letter of credit, or cash escrow. *Id.* It is provided to the 1992 Plan if a 1988 last signatory operator does not maintain its own plan. *Id.* § 9711(c)(3)(A)(ii). Westmoreland and its affiliate Basin posted bonds to satisfy the security requirement before filing for bankruptcy.

The Trustees concede that "[s]ecurity is a form of payment." *See Holland as Tr. of United Mine Workers of Am. 1992 Benefit Plan v. Arch Coal, Inc.*, 346 F. Supp. 3d 99, 105–06 (D.D.C. 2018). But they argue that "the money Westmoreland and Basin paid to secure their bonds didn't reach the 1992 Plan's accounts" before bankruptcy because, until then, "Westmoreland and Basin continued their IEPs."

---

[17] They also contend that being jointly and severally liable for Coal Act obligations does not amount to maintaining Coal Act obligations. *See, e.g.,* 26 U.S.C. § 9704(a) (joint and several liability for Combined Fund premiums); *id.* § 9711(a) (same for IEPs); *id.* § 9712(d)(4) (same for 1992 Plan premiums and security). But the Trustees forfeited this claim by failing to raise it at the bankruptcy court.

[18] A 1988 last signatory operator is a coal company that was a signatory to the 1988 wage agreement and was the most recent coal industry employer of a given retiree. 26 U.S.C. § 9701(c)(3)–(4).

Their position does not comport with section 1114. Although Westmoreland's and Basin's bonds did not funnel cash directly into the 1992 Plan, section 1114 does not require that. Under the statute, "retiree benefits" include "payments to *any entity* . . . for the purpose of providing . . . retired employees . . . medical . . . benefits . . . under any plan, fund or program . . . maintained . . . by the debtor" made prior to bankruptcy. 11 U.S.C. § 1114(a) (emphasis added). Westmoreland and Basin made the bond payments prior to bankruptcy with the purpose of providing their retirees health care benefits if they ever stopped operating their individual plans. Those payments ensured that the 1992 Plan would be able to "bear the expense of" additional retirees displaced from their individual plans. *See Maintain*, Black's Law Dictionary, *supra*. As a result, the bond payments fit the definition of "retiree benefits" even if the 1992 Plan did not receive them prior to bankruptcy.

## B.

Having determined that Coal Act obligations are "retiree benefits" under section 1114, we now consider the potential clash between those two laws. When evaluating two laws that may conflict, we must "regard each as effective" if they "are capable of co-existence" unless there is "a clearly expressed congressional intention to the contrary." *Morton v. Mancari*, 417 U.S. 535, 551 (1974).

## 1.

The Trustees' broadest attack is that several provisions of the Coal Act affirmatively "block" the negotiation process that section 1114 requires for a debtor to modify its Coal Act obligations.

The first Coal Act protection they invoke, 26 U.S.C. § 9722, may coexist with a section 1114 proceeding. As mentioned, this provision nullifies "any transaction" with the "principal purpose" of "evad[ing] or avoid[ing]

liability" under the Coal Act.  26 U.S.C. § 9722.  *Walter Energy* recognized that the Coal Act could thus bar a section 1114 modification that has a principal purpose of avoiding Coal Act liability.  *See* 911 F.3d at 1149–50.  But the modification was not so motivated in that bankruptcy; instead "the purpose of the sale was to provide the best possible outcome for the various stakeholders because it would allow some of Walter Energy's mines to continue operating."  *Id.*  We do not have any findings to support such a conclusion here because this is a declaratory judgment action brought in anticipation of a section 1114 modification attempt.  To be sure, the findings that section 1114 requires for court-mandated modification—that "such modification is necessary to permit the reorganization of the debtor and assures that all creditors, the debtor, and all of the affected parties are treated fairly and equitably, and is clearly favored by the balance of the equities," 11 U.S.C. § 1114(g)(3)—would usually preclude a finding that the principal purpose was to extinguish Coal Act obligations.  In any case, requiring the bankruptcy court to make a principal purpose finding whenever a debtor attempts to modify its Coal Act obligations maintains a role for both section 1114 and section 9722.

The problem with the Trustees' next argument is that it does not give force to both statutes but instead asks us to displace the bankruptcy modification procedure in favor of a Coal Act provision.  The Trustees contend that the provision stating that "[a]ll liability for contributions to the Combined Fund . . . shall be determined exclusively under" the Coal Act, 26 U.S.C. § 9708, means there is no role for the Bankruptcy Code to modify those obligations.  But there is a narrower reading of section 9708 that gives it meaning while preserving a role for section 1114.  Section 9708's title

("Effect on pending claims or obligations") and text[19] indicate that it "serve[s] a specific, narrow purpose: to address the effect that the creation of the Combined Fund had on coal companies' existing and future obligations to the 1950 and 1974 Benefit Plans." *Walter Energy*, 911 F.3d at 1149. The Eleventh Circuit explained it well:

> In the first sentence, Congress explained that because the Combined Fund was replacing the 1950 and 1974 Benefit Plans, the Coal Act—not the wage agreements—would determine coal companies' liabilities for contributions going forward. The next sentence clarified that to the extent that a coal company owed obligations to the 1950 and 1974 Benefit Plans that pre-dated the creation of the Combined Fund, those obligations would remain.

*Id.* Accordingly, section 9708 can be read in a quite reasonable way that does not block a bankruptcy court's ability to modify Coal Act obligations.

Lastly, the Trustees point to 26 U.S.C. § 9711(e),[20] which briefly states that benefits for employees not covered by the Coal Act "shall only be

---

[19] 26 U.S.C. § 9708 reads in relevant part:

All liability for contributions to the Combined Fund that arises on and after February 1, 1993, shall be determined exclusively under this chapter, including all liability for contributions to the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan for coal production on and after February 1, 1993. However, nothing in this chapter is intended to have any effect on any claims or obligations arising in connection with the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan as of February 1, 1993 . . . .

[20] 26 U.S.C. § 9711 is entitled "Continued obligations of individual employer plans." Subsection (e) reads:

Treatment of noncovered employees.—The existence, level, and duration of benefits provided to former employees of a last signatory operator (and their eligible beneficiaries) who are not otherwise covered by this chapter

determined by, and shall be subject to, collective bargaining, lawful unilateral action, or other applicable law." This subsection, they argue, implies that Coal Act obligations *are not* subject to "collective bargaining, lawful unilateral action, or other applicable law." That is a strong negative inference to draw from the fairly bland language of section 9711(e). We agree with other courts that read section 9711(e) as leaving benefits for noncovered employees to future collective bargaining agreements or legislation. *See Pa. Mines Corp. v. Holland*, 197 F.3d 114, 118 n.1 (3d Cir. 1999); *Barrick Gold Expl., Inc. v. Hudson*, 823 F. Supp. 1395, 1400–01 (S.D. Ohio 1993), *aff'd*, 47 F.3d 832 (6th Cir. 1995). Section 9711(e) hardly amounts to the clear indication required to show that Coal Act benefits should not be subject to "other applicable law[s]" like section 1114.

2.

The Trustees' next structural argument stems not from the Coal Act but from another part of the Bankruptcy Code. They cite the statute requiring a bankruptcy court to confirm that a reorganization plan provides for the payment of retiree benefits "for the duration of the period *the debtor has obligated itself* to provide such benefits." 11 U.S.C. § 1129(a)(13) (emphasis added). According to the Trustees, the "obligated itself" language means that "retiree benefits" must be voluntarily assumed, not imposed involuntarily by statute.

Even assuming that is true, the Trustees do not carry the day.[21] Coal companies "did in some sense previously obligate themselves to provide the

---

and who are (or were) covered by a coal wage agreement shall only be determined by, and shall be subject to, collective bargaining, lawful unilateral action, or other applicable law.

[21] The phrase "obligated itself" must have some meaning. But it is hard to say that two words in a different section of the statute books restrict section 1114's scope to

retiree health care benefits" now required under the Coal Act. *Walter Energy*, 911 F.3d at 1145. The Coal Act imposes obligations only on signatories to the wage agreements from 1978 onward that guaranteed lifetime health care benefits to miners. And the Supreme Court has found that initial voluntariness significant in past Coal Act litigation. *See E. Enterprises*, 524 U.S. at 530–37 (plurality opinion) (holding that levying Coal Act premiums on a pre-1978 signatory operator was an unconstitutional taking because the operator never agreed to provide lifetime benefits to its retirees); *id.* at 549–50 (Kennedy, J., concurring in the judgment and dissenting in part) (finding due process violation on similar retroactivity grounds). So although Coal Act obligations are now "undeniably involuntary," *In re Sunnyside Coal Co.*, 146 F.3d 1273, 1278 (10th Cir. 1998), Westmoreland did originally "obligate[] itself" to provide lifetime health care benefits to its retirees through the National Bituminous Coal Wage Agreements.

---

voluntarily assumed retirement obligations to the exclusion of statutorily imposed ones when section 1114 makes no such distinction. *See Wirtz v. Local Union No. 125, Laborers' Int'l Union of N. Am., AFL-CIO*, 389 U.S. 477, 482 (1968) ("Such a severe restriction . . . should not be read into [a] statute without a clear indication of congressional intent to that effect."). The Fourth Circuit refused to draw a similar line when it rejected the argument that a free-and-clear order could not extinguish coal companies' Coal Act premium obligations because the premiums are taxes. *Leckie Smokeless*, 99 F.3d at 585–86 (addressing 11 U.S.C. § 363(f)(5)). Observing that the Bankruptcy Code did not differentiate taxes from other obligations subject to section 363, it concluded that "Congress has given no indication that bankruptcy courts cannot order property sold free and clear of interests that Congress has itself created by statute." *Id.* at 586. Nevertheless, because we hold that Westmoreland effectively "obligated itself" to provide Coal Act benefits, we do not need to decide whether a debtor must always voluntarily assume its "retiree benefits" to modify them under section 1114.

3.

Finally, the Trustees argue that section 1114 assumes "retiree benefits" are "negotiable" because it permits a bankruptcy court to modify them only after the debtor negotiates with the retirees' representative and the representative rejects a debtor's modification proposal "without good cause." *See* 11 U.S.C. § 1114(e)(1), (f)–(g). But because the Coal Act's financing obligations are statutorily mandated, the argument goes, they are nonnegotiable and therefore cannot be modified under section 1114. Although we address this argument last, it may be the closest one, as it captures the uneasy fit between a bankruptcy code provision that typically deals with benefits created by contracts and Coal Act premiums that are imposed by statute.

The first step of the argument is correct. Section 1114's modification scheme not only presumes but *requires* a back-and-forth negotiation between the debtor's trustee and the retirees' authorized representative. *See id.* § 1114(f). Indeed, Westmoreland acknowledges that section 1114's structure indicates that "retiree benefits" must be negotiable. The Eleventh Circuit came to the same conclusion. *Walter Energy*, 911 F.3d at 1145.

The second step of the Trustees' argument is the difficult question. To be sure, the Coal Act imposes its financing obligations in mandatory terms. *E.g.* 26 U.S.C. § 9704(a) (Combined Fund); *id.* § 9712(d)(1) (1992 Plan); *see also Pa. Mines*, 197 F.3d at 119 n.2 ("[W]hatever discretion the 1992 Plan Trustees have in making eligibility determinations is bounded by the mandatory terms of the Coal Act."). But past settlements between the Trustees and other Coal Act obligors indicate that Coal Act obligations are "to some extent negotiable." *Walter Energy*, 911 F.3d at 1145 ("That the Funds have agreed to modify premiums in the past shows that the obligations are negotiable."); *see also, e.g.*, *Holland v. Va. Lee Co.*, 188 F.R.D. 241, 246,

256–57 (W.D. Va. 1999) (enforcing settlement in which coal company paid Trustees lump sum in exchange for release "from any and all past and future funding liability to the Combined Fund"); *In re Bethlehem Steel Corp.*, 2004 WL 601656, at \*2 (Bankr. S.D.N.Y. Feb. 9, 2004) (describing settlement in which Coal Act obligor paid Trustees lump sum in exchange for, *inter alia*, release of "claims for the funding of the provision of health care benefits by the 1992 Plan"). Although a settlement does not affect the Coal Act's statutory provisions, it can permit a coal company to pay something less than the Act requires by preventing the settlement's counterparty from enforcing against that company the Act's full obligations. A coal company can thus negotiate with its retirees' representative an effective "modification" of its Coal Act obligations (as enforceable by the retirees) through the back-and-forth bargaining process described in section 1114.

Another circuit's decision on a closely related issue is instructive. Section 363 permits a bankruptcy trustee to sell property free and clear of another entity's interest in the property if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5). The Fourth Circuit held that the Trustees could be required to accept a money satisfaction of their Coal Act interests, so it affirmed a district court's free-and-clear order. *Leckie Smokeless*, 99 F.3d at 585. That the Trustees can be forced to accept a money satisfaction of their Coal Act interests further illustrates that Coal Act obligations are not as set in stone as the Trustees claim them to be. Rather than create a circuit split that would result in different treatment of debtors in different circuits, we will follow the Fourth and Eleventh Circuit's view that the Coal Act does leave some room for negotiation. At a minimum, the Coal Act's perceived non-negotiability is not so clear that it displaces a bankruptcy law otherwise directly applicable to the situation we confront.

\* \* \*

Given who the parties are, it may seem like this case decides whether retirees will receive their promised benefits. But that is not what is at stake; the retired miners will receive their benefits regardless of this case's outcome. *Walter Energy*, 911 F.3d at 1156. The question instead is whether Westmoreland must continue to pay those obligations or whether the government—that is, the taxpayers—will have to pick up the slack.

To find the answer, we have to reconcile two laws addressing the persistent problem of underfunded retiree health care benefits. That duty does not let us pick the law that we think is the better policy. We must instead give effect, when possible, to both section 1114 and the Coal Act. The unusual nature of the Coal Act—a codification of retirement benefits that are ordinarily (and were originally) the product of private bargaining—makes that task a difficult one. But seeing no clear indication that Congress intended to carve out Coal Act obligations from section 1114's reach, we hold that section 1114 can apply to those obligations. And recall that section 1114 prohibits the unilateral changes to a debtor's retirement obligations that were once common. A section 1114 modification is allowed only if the debtor and the retirees' representative agree or the bankruptcy court orders changes after finding that the equities favor modification.

We therefore AFFIRM the bankruptcy court's ruling that Coal Act obligations may be modified via section 1114, though we clarify that a court must find that the principal purpose of the transaction is not to avoid liability under the Act.